IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

AMERICANS FOR CITIZEN VOTING PAC,

      Plaintiff,

      v.                            Case No. 26-CV-0786

MEAGAN WOLFE, et al.,

      Defendants.

---

## DEFENDANTS' BRIEF IN OPPOSITION
## TO MOTION FOR TEMPORARY RESTRAINING ORDER
## OR PRELIMINARY INJUNCTION

---

JOSHUA L. KAUL
Attorney General of Wisconsin

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (CG)
(608) 266-8101 (HSJ)
Charlie.Gibson@wisdoj.gov
Hannah.Jurss@wisdoj.gov

# INTRODUCTION

Plaintiff Americans for Citizen Voting PAC seeks a preliminary injunction facially enjoining amendments to Wisconsin laws, 2025 Wisconsin Act 126, that requires circulators for candidate nomination papers and recall petitions to be eligible to vote in Wisconsin. Circulators carry out important duties relating to the truth and accuracy of voter signatures, which are reviewed in fast-moving ballot access challenges, and they are subject to criminal penalties for fraudulent activity. Act 126 furthers Wisconsin's interest in ensuring the integrity of Wisconsin elections and deterring fraud.

Plaintiff's effort to enjoin the law should be denied because it fails to satisfy the four requirements for such relief.

Out of the gate, Plaintiff does not make a strong showing that it is likely to succeed on the merits. It relies on case law reviewing more restrictive limits on who can serve as circulators or where advocates faced greater hurdles, or laws governing Presidential elections. It cites no case that has struck down a requirement that a candidate's nomination paper circulator simply be eligible to vote, a rule that creates a pool of millions of potential circulators.

Even if it could pass the merits prong, Plaintiff cannot satisfy the remaining required factors for relief. It does not demonstrate that it will suffer irreparable harm absent a preliminary injunction. It relies on a presumption of irreparability and offers no proof of objective, immediate harm. Further, the

balance of equities and the public interest weigh against the issuance of a preliminary injunction. Under *Purcell*, the Court should not make changes in election law while that process is in motion, and enjoining duly enacted state statutes constitutes irreparable harm to the State and people of Wisconsin. And Plaintiff's delay in seeking relief also weighs against its request.

## STATEMENT OF FACTS

### I. The process for the circulation of nomination papers and recall petitions has been underway for weeks.

Wisconsin law creates an interlocking, front-to-back process for elections that begins with circulating papers for signatures for the nomination of candidates and for recall petitions. Wis. Stat. §§ 8.10 (nominations for spring elections), 8.15 (nominations for partisan primary), 8.20 (nominations of independent candidates), and 9.10 (recall petitions); *see also* Wis. Admin. Code EL § 2.05. For the 2026 fall elections, the signature process has been underway since April 15, 2026. *See* Wis. Stat. §§ 8.15(1) (partisan candidates), 8.20(8)(a) (independent candidates); (*see also* Kehoe Decl. ¶¶ 14–15). Nomination papers must be filed by June 1, 2026. Wis. Stat. §§ 8.15(1), 8.20(8)(a); (*see also* Kehoe Decl. ¶ 16). Candidates must gather between a few hundred to a few thousand signatures, depending on the office: for state senate, 400 to 800 signatures are required, while for Governor, 2,000 to 4,000. Wis. Stat. § 8.15(6)(c), (a).

2

## II. Circulators, who must be eligible to vote in Wisconsin, provide a certification about to the signatures collected for a candidate non-presidential candidate.

Circulators assist a candidate in obtaining the required number of signatures for a candidate's nomination papers or for a recall election to occur. *See* Wis. Stat. §§ 8.10, 8.15, 8.20, 9.10; (*see also* Kehoe Decl. ¶ 7). Circulators must provide a certification attesting to the facts relating to the signature and signer. Wis. Stat. §§ 8.15(4)(a), 8.20(3), 8.40(2). Under Act 126, circulators must also be eligible to vote in Wisconsin. 2025 Wis. Act 126; (*see also* Kehoe Decl. ¶ 9); (Dkt. 1-1:21).[1] The voter-eligibility requirement does not apply to presidential/vice-presidential candidate papers or to referendum petitions. *See* 2025 Wis. Act 126; (*see also* Kehoe Decl. ¶ 6). Neither Act 126 nor any other provision of Wisconsin law prevents others—whether Wisconsin residents or otherwise—from accompanying a circulator or advocating alongside a circulator during signature collection. (Kehoe Decl. ¶ 28.)

## III. The election process proceeds speedily, with a tight window for challenges to nomination papers.

Wisconsin's election process proceeds in fast-moving, interlocking steps. After nomination papers are submitted, opponents may challenge the validity or adequacy of nomination papers and recall

---

[1] The online version of the Wisconsin statutes has not yet been updated to include Act 126's changes. The PDF of Act 126, which provides all the changes in full, is available online here: https://docs.legis.wisconsin.gov/2025/related/acts/126.pdf (last visited May 8, 2026).

3

petitions. Wis. Admin. Code EL §§ 2.07, 2.11; *see also* Wis. Stat. § 8.07. For the upcoming 2026 elections, for nomination papers filed by June 1, 2026, challenges must be made by June 4, 2026. Wis. Admin. Code EL § 2.07(3)(b); (*see also* Kehoe Decl. ¶ 30). Those challenges must be then decided by the filing officer (the Commission or filing officer, depending on the office) not later than June 10, 2026. Wis. Admin. Code EL § 2.07(3)(h); (*see also* Kehoe Decl. ¶ 34).

The Commission must then certify the list of candidates as soon as possible after the June 10, 2026, ballot determination deadline. Wis. Stat. § 10.06(1)(h); (*see also* Kehoe Decl. ¶ 35). Upon receiving certifications from the Commission, county clerks must arrange to have those ballots printed and delivered to each municipal clerk in the county by June 24, 2026. Wis. Stat. § 7.10(1)(a), (2), (3)(a); (*see also* Kehoe Decl. ¶ 42). Municipal clerks must then send absentee ballots to voters with an absentee ballot request on file—including military and overseas voters—by June 25, 2026. Wis. Stat. §§ 7.15(1)(cm), 7.22, 7.24; 52 U.S.C. § 20302(a)(8); (*see also* Kehoe Decl. ¶ 42).

**IV. In 2024, petitions to recall Robin Vos led to signature challenges and a and a separate criminal referral by the Commission.**

In 2024, Wisconsin saw multiple unsuccessful petitions to recall Representative Robin Vos. Petitions were subject to challenges by Representative Vos, (*see* Kehoe Decl. ¶¶ 47–48, Ex. A–B), and separately, in

4

2026, the Commission made a criminal referral to the Racine County District Attorney, (Kehoe Decl. ¶¶ 48–50, Ex. C).

The Commission investigates violations of Wisconsin's election laws upon submission of a complaint to the Commission. Wis. Stat. §§ 5.05, 5.06. It found probable cause to believe that violations of Wisconsin law occurred related to efforts to recall Representative Vos. (Kehoe Decl. ¶¶ 48–50, Ex. C.)

As reflected in its February 27, 2026, letter to the District Attorney, the Commission found probable cause to believe that people had falsely listed an address that was not their residence on the circulator certification signed. (Kehoe Decl. ¶ 49, Ex. C.) The Commission also found probable cause to believe that multiple persons violated Wisconsin law prohibiting falsifying or fraudulently defacing or destroying a recall petition, given evidence from several individuals who attested that they had not actually signed the recall petition at issue. (Kehoe Decl. ¶ 50, Ex. C.)

In a separate proceeding, challenging one of the petition's signature sufficiency,[2] Speaker Vos asserted that a private investigator found that four out-of-state convicted felons circulated 94 recall papers, (*id.* at 5), and that an "alarming number of people ha[d] come forth to state that their names were

---

[2] (Kehoe Decl. Ex. A.) Speaker Vos submitted verified challenges to multiple recall petitions. (*See* Kehoe Decl. ¶¶ 47–48, Ex. A–B.) The exhibits to Speaker Vos's verified challenge dated June 7, 2024, are available online on the Commission's website as part of the Commission's Open Session Materials from June 27, 2024, available at: June 2024 Quarterly Meeting 6/27/2024 | Wisconsin Elections Commission (last visited May 8, 2026).

fraudulently included in the recall petitions," including multiple minors, (*id.* at 8). Speaker Vos explained that a woman attested that she was approached by two men in a parking lot who asked if she would sign a petition supporting "women's rights," that she was prevented from getting into her car until she signed the petition, and that the petition she signed proved to be a recall petition. (*Id.*)

> ### V. Plaintiff filed suit on April 29, 2026, over one month after Act 126's enactment and two weeks after the nomination paper circulation period began.

On April 29, 2026, over one month after Act 126's enactment on March 27, 2026, and two weeks after the circulation period for nomination papers began, Plaintiff brought suit in state court, raising facial challenges to Act 126's provisions. (Dkt. 1-1:10–18.)

Plaintiff is based in Fairfax, Virginia, and alleges that it seeks to support candidates who "promote election integrity" and "support policies that ensure only United States citizens vote in American elections." (Dkt. 1-1:12.) It asserts that it wishes to work with persons who do not reside in Wisconsin "to collect nomination signatures in Wisconsin." (Dkt. 1-1:12.) In support of its motion for preliminary injunction, it notes that it has entered into an agreement with a Michigan-based entity that hires petition circulators. (Dkt. 6-5:3.)

The Commission removed this matter on May 4, 2026. (Dkt. 1.) Plaintiff moved for a temporary restraining order and preliminary injunction that

6

day. (Dkt. 6.) It reserves the right to request further relief, "which may include extending the June 1 deadline." (R. 6-1:22.)

### VI. The interim relief Plaintiff seeks would pose significant challenges to the administration of Wisconsin's 2026 election.

A temporary injunction of Act 126 would pose significant administrative challenges for the Commission and county clerks and would risk confusion for the Wisconsin public. The circulator requirements apply to roughly 130 state and congressional offices and over 150 county offices. (Kehoe Decl. ¶ 15.)

Uncertainty about circulator requirements may create significant confusion for circulators, signers, candidates, county clerks, the Commission, and persons who may wish to raise challenges to nomination papers, conducted under two different laws. (Kehoe Decl. ¶¶ 36–38.) It may also create confusion amongst county filing officers, who are not defendants but who are responsible for determining challenges to nomination papers for county offices. (Kehoe Decl. ¶¶ 36–39, 31–32.)

Any extension of the June 1 deadline for filing nomination papers would have significant consequences for the election because of the tight timeline between each election step. (Kehoe Decl. ¶¶ 40–42.) Endangered would be the Commission and clerks' compliance with deadlines to certify candidates, create ballots, and send ballots to overseas voters. (Kehoe Decl. ¶¶ 41–42.)

7

## LEGAL STANDARD

A preliminary injunction is an extraordinary and drastic remedy and is never awarded as a matter of right. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). It is a "very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)).

The moving party bears the burden to show that such extraordinary relief is warranted. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). To justify a preliminary injunction, a movant must satisfy *all* the relevant factors. The movant must make a "strong showing that she is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). If the movant makes such a showing, she "must also demonstrate . . . 'irreparable injury . . . in the absence of an injunction,' . . . [that] the balance of equities must 'tip in the [movant's] favor,' and [that] the 'injunction [is] . . . in the public interest.'" *Id.* at 763 (citation omitted).

Further, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). When balancing the equities, a moving party's unnecessary delay in requesting a preliminary injunction will weigh against their request. *Id.* at 160.

8

## ARGUMENT

**I.** **Plaintiffs do not show that they are likely to succeed on the merits.**

Under the likelihood of success prong, the movant "must make a strong showing" that they are likely to succeed on the merits. *Pritzker*, 973 F.3d at 762. A "'better than negligible' chance" of success is not enough. *Id.* (citation omitted). Plaintiff cannot meet that standard here. Plaintiff relies on the Seventh Circuit's now superseded "some likelihood" of success standard (Dkt. 6-1:13 (citation omitted)), but that is not the law since *Pritzker*.

Act 126 imposes no severe burdens: anyone in Wisconsin eligible to vote can be a circulator, and Plaintiff offers no evidence that any candidate (or their advocates) faces hurdles in gathering signatures. Even if Act 126 were subject to heightened scrutiny, the State has compelling interests, and the law is narrowly tailored to address them. The candidate circulator regulations rejected by courts were different, imposing restrictions that significantly limited the pool of circulators or involved different types of elections.

**A.** **While cases reviewing circulator regulations have gone in both directions, the most analogous cases support the constitutionality of Act 126.**

Plaintiff tells the Court that the case law has decisively concluded that all eligibility-to-vote requirements for circulators, regardless of geographic scope, referendum or candidacy, or even type of candidacy, are unconstitutional. That is incorrect. Courts must examine the particulars of an

9

election regulation to determine its constitutionality, and a law like Act 126 passes muster.

### 1. States have broad leeway to regulate elections, and election regulations not posing a severe burden are subject to rational basis review.

In *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997), the Supreme Court recognized that while candidates and parties have First Amendment rights of association that enjoy constitutional protection, States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election and campaign-related disorder.

To decide whether a state election law violates the First or Fourteenth Amendment, courts "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Id.* at 358 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). While regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest, lesser burdens trigger less exacting review, "and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions." *Id.* (quoting *Burdick*, 504 U.S. at 434).

"[N]o litmus-paper test . . . separat[es] those restrictions that are valid from those that are invidious . . . . The rule is not self-executing and is no

substitute for the hard judgments that must be made." *Storer v. Brown,* 415 U.S. 724, 730 (1974).

### 2. In the context of referenda initiatives, the Supreme Court has examined whether the message can be carried to the State's voters, or faces significant hurdles in reaching the ballot.

The seminal U.S. Supreme Court cases relating to regulation of signature gatherers, *Meyer v. Grant,* 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), both involved regulation of the signature-gathering process for initiatives. The Court's analysis focused on the actual burden imposed on the message's reaching the people and ability to come before the people on the ballot.

In *Meyer*, the Court struck down a law that prohibited paying people to circulate initiatives or referenda petitions, a job that the Court interpreted to include "persuad[ing] [voters] that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate." *Meyer*, 486 U.S. at 421. The Court concluded that the regulated activity of promoting an initiative would "in almost every case involve an explanation of the nature of the proposal and why its advocates support it." *Id.* at 421–22.

The Court identified two considerations to aid in determining whether an initiative regulation imposes a severe burden triggering heightened scrutiny: the extent to which it limits the number of voices carrying the

11

initiative proponent's message and size of the audience the proponent can reach; and the extent to which the regulation makes it less likely the measure will reach the ballot, the mechanism for the issue to be "the focus of statewide discussion." *Id.* at 422–23.

In *Buckley*, the Court considered requirements imposed by Colorado on signatures for constitutional initiatives. *Buckley*, 525 U.S. at 205. The plaintiffs had challenged multiple provisions of a law imposing hurdles to citizen-initiated referenda; the Tenth Circuit had rejected some, including that an initiative-petition gatherer be registered to vote and wear a badge with their name and volunteer status. *See Am. Const. L. Found., Inc. v. Meyer*, 120 F.3d 1092, 1096 (10th Cir. 1997). The Supreme Court affirmed the Tenth Circuit's decision. *Buckley*, 525 U.S. at 186.

The Court began by recognizing that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* at 187 (citation omitted). The Court reasoned that the legal questions surrounding initiative petition gatherers were a hybrid of two different strands of law: those relating to candidate-petition circulators, which relied on ballot access principles in *Timmons*, and handbill distributors advocating for change, governed by *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995).

The Court then assessed the burden caused by Colorado's voter registration requirement. The Court pointed to the plaintiffs' evidence that requiring registration, and not just eligibility to vote in Colorado (which Colorado also required), reduced the pool of potential gatherers from Colorado's adult population by about 400,000, which both significantly decreased the number of voices who would convey the proponents' message and substantially reduced the chances that the initiative would reach the ballot. *Buckley*, 525 U.S. at 194–95.

The Court did not determine the constitutionality of Colorado's separate eligibility-to-vote requirement, which the plaintiffs had not challenged. *Id.* at 197. But it reasoned that Colorado's interest in being able to locate and subpoena circulators to investigate the validity of signatures was met by the requirement that they attest to their Colorado address. *Id.* at 196.

In dissent, Chief Justice Rehnquist suggested the majority's decision would be read to preclude States from imposing an elector or residency requirement, suggesting that children or foreign citizens must be permitted and many state laws would appear to be "in serious constitutional jeopardy." *Id.* at 231–32 (Rehnquist, C.J., dissenting). The majority rejected his concerns, quoting Judge Bork that "[j]udges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom." *Id.* at 194 n.16.

**3. Lower courts have since rejected laws requiring petition circulators to live in a subdivision of a State, but are divided on laws requiring only statewide presence or eligibility.**

Since *Buckley*, numerous courts have considered state and local laws that regulate who may circulate initiative petitions. While they have rejected laws that limit the pool of circulators to residents of political subdivisions like cities or counties, they are divided on whether a State can require that a circulator be a resident or eligible to vote in the State as a whole.

Courts agree that laws or ordinances requiring petition circulators to live in a particular subdivision of a State, like a particular state assembly district, are unconstitutional. This is unsurprising, since such laws limit the pool of potential circulators dramatically.

For example, in *Chandler v. City of Arvada*, 292 F.3d 1236, 1244 (10th Cir. 2002), the Tenth Circuit invalidated an ordinance that required petition circulators to be residents of the City of Arvada. The court reasoned that such circulators are like handbill distributors seeking to garner public support for a viewpoint, and that it is "no small undertaking" to get a measure on the ballot. *Id.* at 1241 (citation omitted); *see also KZPZ Broad., Inc. v. Black Canyon City Concerned Citizens*, 13 P.3d 772 (Ariz. Ct. App. 2000) (requiring county residency); *Preserve Shorecliff Homeowners v. City of San Clemente*, 158 Cal.App. 4th 1427, 1443–44 (Cal. Ct. App. 2008) (ordinance requiring referendum circulators to be city residents).

14

In contrast, where any person eligible to vote in a State can serve as a circulator, the circuits have reached differing conclusions.

Two circuits have concluded that such regulations are not even subject to heightened scrutiny. The Eleventh Circuit concluded that a Florida law requiring petition circulators to be eligible to vote in Florida did not trigger heightened scrutiny because it did not substantially limit the ability of noncitizens and nonresidents to speak on the issue. *Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, *4 (11th Cir. Sept. 9, 2025). The law required circulators to collect and deliver petitions, which the court doubted "was speech at all." *Id.* And the court reasoned that the law did not prohibit noncitizens or nonresidents from engaging those voters in persuasive speech for their views. *Id.*

In *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001), the Eighth Circuit concluded that no heightened scrutiny was appropriate because the regulation there, which required North Dakota residency, caused no significant drop-off in the number of potential circulators: "all 476,000 of North Dakota's eligible voters may circulate petitions, unlike the situation in *Buckley*, where many Colorado residents would have been unable to engage in petition circulation." *See also Idaho Coal. United For Bears v. Cenarrusa*, 234 F. Supp. 2d 1159, 1163–64 (Idaho 2001) (applying reasonableness standard to residency requirement).

Some district positions have taken an intermediate position, requiring heightened scrutiny but finding that the State met that standard. In *Kean v. Clark*, 56 F. Supp. 2d 719, 732 (S.D. Miss. 1999), for example, the court held there were compelling interests in requiring initiative circulators to be eligible to vote in the State, discussing the State's concern that it could not effectively prosecute criminal violations by out-of-state circulators.

The Tenth, Ninth, and First Circuits have rejected laws that imposed residency requirements for initiative circulators. In *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1026 (10th Cir. 2008), the Tenth Circuit concluded that strict scrutiny applied to its review of an Oklahoma residency requirement where the plaintiffs asserted there were not enough professional initiative circulators in Oklahoma to gather signatures. In *Pierce v. Jacobsen*, 44 F.4th 853, 859 (9th Cir. 2022), and *We the People PAC v. Bellows*, 40 F.4th 1, 18 (1st Cir. 2022), the Ninth and First Circuits rejected residency requirements for petition circulators, relying on *Meyer*'s statement that advocating for initiatives was "core political speech" involving "interactive communication concerning political change." Under that framework, the courts concluded that it didn't matter whether referendum proposals were successfully reaching the ballot. *Pierce*, 44 F.4th at 861; *We the People PAC*, 40 F.4th at 18.

**4. For candidate signature circulators, state residence has been rejected only in the context of Presidential candidacies.**

*Meyer* and *Buckley* did not address regulations for *candidate* signature gathering. *Buckley* recognized that campaign nomination papers fall under *Timmons*, and courts reviewing regulations about candidate signature circulators have generally focused on the burden they place on candidates to gain access to the ballot. Only in the context of Presidential elections, where the States' interests carry less weight than other election contests, have courts rejected state residency regulations standing alone.

Two circuits have rejected candidate signature regulations that limited participation far more strictly than statewide residence. In *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000), and *Lerman v. Board of Elections of N.Y.*, 232 F.3d 135 (2d Cir. 2000), the Seventh and Second Circuits struck down two candidate circulator laws: an Illinois statute that required circulators to be registered to vote and to live in the district of the relevant office, and a New York law that required circulators to be registered to vote in the candidate's party and be a resident of the office's political subdivision. *Krislov*, 226 F.3d at 856; *Lerman*, 232 F.3d at 139.

In both cases, the plaintiffs presented evidence that the laws created significant hurdles to their appearance on the ballot. In *Krislov,* the two plaintiffs faced challenges that some circulators were not registered voters in

the relevant districts; the plaintiff who wanted to run for the U.S. House of Representatives also needed to find registered voters living in his congressional district. *Id.* at 856. In *Lerman*, the candidate wanted to run for the New York City Council, but there were only 760 people who were eligible circulators, and he did not appear on the ballot. *Lerman*, 232 F.3d at 139, 147.

In striking down the two laws, the courts focused on the number of circulators excluded. *Krislov* held that "[w]hat is particularly important in this case, and what was correctly the focus of the district court's attention, is the number of people the registration and residency requirements exclude." *Krislov*, 226 F.3d at 860. The court compared the number of people eligible under the law to all adult Illinois residents, resulting in a reduction "in the millions," *Lerman* concluded that the New York provision severely burdened political speech by "drastically reduc[ing] the number of persons . . . available to circulate petitions." *Lerman*, 232 F.3d at 146 (alteration in original) (citation omitted).

In dicta, *Lerman* said that a statewide residency requirement, standing alone, *would* pass constitutional muster. The court reasoned that the State's interest in protecting the integrity of elections was achieved by the "less burdensome" requirements that petition gatherers live in the State of New York, subjecting them to the State's subpoena power, and providing their residence address. *Id.* at 150. And *Krislov* noted that the State could regulate

<div align="center">18</div>

non-citizen circulators if it presented a compelling interest like deterring fraud. *Krislov*, 226 F.3d at 866 n.7.

In *Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003), the district court applied the same framework to a Wisconsin law that required circulators to live in a specific political district. The court found that the restrictive geography created a significant burden for the plaintiffs, who were members of a small third party, and concluded that the State did not provide compelling reasons for the local requirement. *Id*. at 965, 968.

As to laws allowing circulators from anywhere in a State or simply voter-eligible, challenges have reached the appellate courts only in the context of *presidential* campaigns. The Supreme Court has explained that States have reduced interests in election regulations that govern presidential elections because their results affect every person in the United States:

> [I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation. Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.

*Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983) (footnotes omitted). Thus, even where a statewide or voter-eligibility requirement would normally pass

muster, it does not in the presidential candidacy setting. *See Daien v. Ysursa*, 711 F. Supp. 2d 1215, 1233 (D. Idaho 2010).

Thus, in three suits brought by third party candidates for President or their supporters, courts held that States could not limit out-of-state voters gathering candidate signatures to residents of that State. *See Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008); *Nader v. Blackwell*, 545 F.3d 459, 475 (6th Cir. 2008); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013).

**B.    Act 126's provisions are constitutional; they do not severely burden speech, and even if they were subject to heightened scrutiny, the State has compelling interests and a narrowly tailored solution.**

Here, Wisconsin's law presents none of the severe burdens that caused some courts to invalidate other types of circulator regulations. Plaintiff makes no effort to show that the law severely burdens candidates in procuring enough signatures to appear on the ballot; most of the circulator's duties are not even speech. And Act 126's provisions do *not* apply to circulators for referenda or presidential candidates, so the First Amendment concerns in those contexts have no bearing here.

Even if Wisconsin's law were subject to heightened scrutiny, it would pass that test. The Supreme Court has recognized that preventing fraud and ensuring the integrity of elections are compelling interests, and Act 126 is narrowly tailored to address those concerns.

### 1. Wisconsin's circulator tasks either involve no speech or do not severely burden the ability of candidates to appear on the ballot.

To begin, Act 126 does not impose severe burdens on speech. Most of the circulator's duties do not involve advocacy, and the one duty that may involve speech creates no severe burdens on candidates, who may draw on almost any adult Wisconsinite to serve in the role.

Wisconsin law requires candidate nomination papers to be accompanied by a signed and dated statement by the "qualified circulator" (who may also be the candidate him- or herself), certifying to seven things:

- He or she personally circulated the nomination paper and personally obtained each of the signatures;

- He or she knows they are electors of the ward, aldermanic district, municipality or county, as the nomination papers require;

- He or she knows they signed the paper with full knowledge of its content;

- He or she knows their respective residences given;

- He or she knows each signer signed on the date stated opposite his or her name;

- He or she intends to support the candidate; and

- He or she is aware that falsifying the certification is punishable under Wis. Stat. § 12.13(3)(a).

*See* Wis. Stat. §§ 8.15(4)(a), 8.20(3).

Of the seven attestations, six—all but the attestation of personally circulating and obtaining each signature—have nothing to do with urging others to support a candidate. They instead ensure that the signatures contain

21

the requirements for valid signatures required by state law, compliance with which could be challenged in an opponent's challenge to the candidate's nominating papers. The circulator's name and address must appear on each individual page of the nomination pages, making it clear who has certified those particular signatures, in the event of challenges.

As in *Florida Decides Healthcare Inc.*, such tasks do not appear to impact the First Amendment at all, much less trigger heightened scrutiny. *Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *4. And they do not acquire First Amendment protection just because they are combined with another activity that involves speech. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 297–98 (1984).

That leaves the first circulator duty, attesting that he circulated the paper itself and obtained the signatures. As an initial matter, and as in *Florida Decides Healthcare*, this requirement does not prevent a non-Wisconsinite from accompanying a qualified circulator as she hands out nomination papers to sign, and speaking about their own views on the candidate. *Fla. Decides Healthcare Inc.*, 2025 WL 3738554, at *4; (Kehoe Decl. ¶ 28). But even if the non-circulator has some limitations because a qualified circulator must accompany him, candidates still experience no severe burden on ballot access because almost every Wisconsin adult can be a circulator.

For purposes of measuring whether a state regulation creates a severe burden, *Buckley* treated a State's adult population as the baseline, and then subtracted the members of the population who could not serve. *See Buckley*, 525 U.S. at 194–95. Unlike in *Buckley*, where Colorado's voter registration requirement reduced the number of eligible circulators from the total adult Colorado population by 400,000 people, Act 126's provisions includes the entire adult population to serve, so long as they have not been adjudged incompetent, not lived 28 days at an address, or are serving a felony criminal sentence. *See* Wis. Stat. § 6.03 (disqualifications to vote); (Dkt. 1-1:21).

Wisconsin's regulation is thus like the one upheld in *Jaeger*, where the court held that no heightened scrutiny was appropriate where the adult population remained available to serve as circulators. And it is unlike the state regulations rejected by courts where stringent local residence, voting registration, or party affiliation requirements created substantial burdens by dramatically reducing the pool of eligible people.

In a citizen initiative setting, depending on the facts, a plaintiff might show that even residency or voting eligibility poses significant burdens because of the large number of signatures needed. *See, e.g.*, *Yes On Term Limits, Inc.*, 550 F.3d at 1026. But for state or local candidate nomination papers, requiring at most a few thousand signatures, such hurdles are unlikely, and Plaintiff presents no such facts here. Plaintiff takes a different tack, announcing that

23

the law is *per se* unconstitutional if it cannot work with out-of-state circulator firms, (Dkt. 6-1:13, 15), but no court has created such a rule. Even in the context of initiative petition circulators, *Buckley* made clear that a court must first find a severe burden. Here, Plaintiff shows none caused by Act 126.

And Plaintiff's citations to cases involving presidential candidacies do not assist it. The standards there are different because the winners govern the entire nation. There is no presidential election this year, and Act 126 does not apply to presidential candidates, in any case.

Act 126's eligibility-to-vote requirement does not severely burden speech and thus is not subject to heightened scrutiny.

> **2. Even if Act 126's provisions were subject to heightened scrutiny, Wisconsin has compelling interests and Act 126 is narrowly tailored to address them.**

Even if Act 126's provisions were subject to special scrutiny, the law has compelling interests and is narrowly tailored to address them.

Courts have recognized that deterring fraud and ensuring the integrity of the election process are compelling interests that justify regulation of candidate elections. *Republican Party of Penn. v. Degraffenreid*, 141 S. Ct. 732, 736 (2021); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). The State's interest in preserving electoral integrity extends "to efforts to ferret out invalid signatures caused not by fraud but by simple mistake, such as duplicate signatures or signatures of individuals who are not registered to vote in the State," and "to

24

promoting transparency and accountability in the electoral process." *John Doe No. 1 v. Reed*, 561 U.S. 186, 198 (2010). Here, requiring candidate circulators for nomination papers and recall petitions to be eligible to vote in Wisconsin ensures that they can be swiftly summoned as witnesses in fast-moving ballot challenges, and they can be held criminally accountable under Wisconsin's law governing such conduct.

Wisconsin's ballot access challenge process takes place on extremely compressed timeframes: this year, nomination papers must be filed by June 1, 2026, challenges must be made by June 4, 2026, and those challenges must be decided by June 10, 2026. Wis. Stat. § 9.10(3)(b), (4)(a); Wis. Admin. Code EL §§ 2.07(3), (3)(b), (j), (7); (*see also* Kehoe Decl. ¶¶ 30, 34).

The facts to which the qualified circulator attests are the facts at issue in a typical ballot access challenge: the voter's understanding of her signature, whether she lives in the relevant district, whether she is eligible to vote. Wis. Stat. § 8.15(4)(a). The circulator's personal knowledge and immediate availability are critical to assessing a ballot challenge. Requiring the circulator to be a Wisconsin elector ensures that he can quickly appear in person to clarify ambiguities in the papers, speak to accusations of fraud, and address other questions relating to a challenge.

Further, the State's criminal penalties applicable to circulator misconduct—Wis. Stat. § 12.13—have teeth only if the State can hale the

person before a court. This is the same compelling interest cited by the court in *Kean*, 56 F. Supp. 2d at 732. In 2026, the Commission found probable cause to believe that multiple circulators from out-of-state had violated that law, including prohibiting falsifying or fraudulently defacing or destroying a recall petition; credible evidence had been presented that listed voters had not actually signed a petition. The Commission made a referral to the Racine County District Attorney. (Kehoe Decl. ¶¶ 49–50, Ex. C.) But for those who do not reside in Wisconsin, they cannot be prosecuted in Wisconsin without extradition. Requiring circulators to be Wisconsin electors ensures that they are meaningfully accountable under that law if they engage in fraudulent election activity.

The law is also narrowly tailored. Any eligible voter in the State can serve, which furthers immediate availability and amenability to criminal prosecution, if needed. The law does not require any local residence and excludes presidential elections and referenda.

Plaintiff points to *Frami*, where Wisconsin failed to demonstrate compelling interests for a law requiring circulators to come from a specific election district. (Dkt. 6-1:18). But the law was different and the interests discussed (requiring a candidate to make a showing of local support, or have elections controlled by local voters) were different. *Frami*, 255 F. Supp. 2d at 968–69. The State did raise a concern about achieving the circulator's

presence for investigating a signature's validity, but the court's response supports a requirement of voter eligibility—it pointed out that the State's subpoena powers extended to people anywhere in Wisconsin. *Id.* at 969. And while the district court suggested that the Supreme Court saw fraud as less of a concern at the nomination stage than at the election, *id.* at 970, the Supreme Court has since reinforced that States have compelling interest in election integrity and deterring fraud at the signature gathering phase. *John Doe No. 1*, 561 U.S. at 233.

## II. Plaintiff fails to show that it will suffer irreparable harm absent an injunction.

Plaintiff's motion should also be denied because it has failed to show that it will suffer irreparable harm absent a preliminary injunction. Plaintiff bears the burden to show that such extraordinary relief is warranted. *Courthouse News Serv.*, 908 F.3d at 1068.

Plaintiff alleges *no* factual harm to any candidate relating to the upcoming election—not a single candidate that it would support but cannot get over the nomination hurdle. It complains that it wants to contract with a Michigan professional circulator, but it fails to show that no Wisconsin professional circulator could provide that service. (Dkt. 6-1:18.) Plaintiff relies instead on a presumption of irreparability based on the fact this is a First Amendment case, but it overreads that principle.

The presumption of irreparable harm applies only where the challenged restriction directly limits the plaintiff's speech. Where, a plaintiff alleges other types of First Amendment injury, it must "articulate a 'specific present objective harm or a threat of specific future harm.'" *Bronx Household of Faith v. Bd. of Educ. of N.Y.*, 331 F.3d 342, 350 (2d Cir. 2003) (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)).

*Citizens United v. Schneiderman*, 115 F. Supp. 3d 457 (S.D.N.Y. 2015), a First Amendment campaign finance challenge, illustrates the point. There, the court concluded that the potential associational harms relating to their anonymous donors did not trigger any presumption of irreparable harm, and that the plaintiffs failed to prove an objective, immediate harm. *Id.* at 473–74.

Here, Plaintiff is not entitled to a presumption of irreparable harm, and it makes no effort to articulate an objective, immediate harm. No court has treated a desire to contract with a particular professional circulator as a constitutional right. (Dkt. 6-5:3.) Plaintiff offers no evidence that it cannot speak, find circulators in Wisconsin to support candidates who will fight non-citizens voting, if they believe that is a problem or identify a candidate that it can no longer support.

Because Plaintiff has failed to show irreparable harm, its motion for a preliminary injunction must be denied.

28

### III. The balance of harms and equities weighs against granting the injunction.

Plaintiff also fails to establish that the balance of equities, the public interest, or balancing of harms favor granting an injunction here. The Court must balance the generalized harm asserted by Plaintiff against the real, concrete irreparable harm to the State and the public if an injunction is granted. And Plaintiff's delay in bringing this case also weighs against it.

Plaintiff is wrong in asserting that there is no harm to the State and the public. (Dkt. 6-1:21.) *First*, the Supreme Court has explained the serious problems associated with modifying election procedures this close to elections: "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. Indeed, even "seemingly innocuous late-in-the-day" changes can "interfere with administration of an election and cause unanticipated consequences." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring).

An injunction here would feature those very problems. Candidates have been collecting signatures since April 15, 2026, complying with current state law. If that law were enjoined, there would be two standards under which signatures would be reviewed: those completed under the law, and those completed outside of it. For ballot challenges, election officials and opposing

candidates will have to utilize different standards for two different time periods, all on the statutorily compressed time period.

*Second*, a state suffers irreparable injury whenever its validly enacted laws are enjoined. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *R.R. Comm'n of Ala. v. Cent. of Ga. Ry. Co.*, 170 F. 225, 233 (5th Cir. 1909) ("the public has an interest in the enforcement of every law until it is repealed or judicially annulled").

*Third*, Plaintiff's unnecessary delay in bringing this motion further tips the balance of equities against the issuance of a preliminary injunction. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *See Benisek*, 585 U.S. at 159. Here, the challenged statute was enacted on March 27, 2026. But Plaintiff waited until April 29, 2026, to seek relief—over four weeks later. Given the tight timeline for the election sequence, from signature collection, ballot challenges, candidate finalization, ballot preparation, and ballot mailing, that wait was unreasonable.

## CONCLUSION

This Court should deny Plaintiff's motion for a temporary restraining order or preliminary injunction.

Dated this 8th day of May 2026.

<div style="margin-left:40%">

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

</div>

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (CG)
(608) 266-8101 (HSJ)
(608) 294-2907 (Fax)
Charlie.Gibson@wisdoj.gov
Hannah.Jurss@wisdoj.gov

## CERTIFICATE OF SERVICE

I certify that on May 8, 2026, I electronically filed the foregoing Defendants' Brief in Opposition to Motion for Temporary Restraining Order or Preliminary Injunction with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 8th day of May 2026.

Electronically signed by:

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General

32