IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

AMERICANS FOR CITIZEN VOTING PAC,

Plaintiff,

v. Case No. 26-CV-0786

MEAGAN WOLFE, et al.,

Defendants.

---

**DEFENDANTS' BRIEF IN SUPPORT OF SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S SUMMARY JUDGMENT MOTION**

---

JOSHUA L. KAUL
Attorney General of Wisconsin

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (CG)
(608) 266-8101 (HSJ)
Charlie.Gibson@wisdoj.gov
Hannah.Jurss@wisdoj.gov

## INTRODUCTION

In 2024, recall petitions filed with the Wisconsin Elections Commission featured signatures raising numerous fraud concerns. Individuals whose signatures appeared attested that they had not signed the petitions, that their minor child's "signature" appeared, or that they were told they did not need to be eligible to vote to sign the petition. Others reported that circulators told them the petition was about supporting women's rights or opposing the sale of farmland to China. Several of the circulators appeared to have out-of-state felony convictions.

After the filing of a complaint, the Wisconsin Elections Commission investigated and found probable cause to refer several circulators, including individuals living outside the State, to the Racine County District Attorney to consider criminal prosecution. In the wake of that referral, Wisconsin enacted 2025 Wis. Act 126, which requires circulators for candidate and recall elections, other than Presidential elections, to be eligible to vote in Wisconsin.

Plaintiff Americans for Citizen Voting PAC seeks to facially invalidate the law, claiming the First Amendment prohibits that reasonable step. But courts impose no such categorical ban. They ask whether the law imposes a severe burden on a plaintiff's ability to get their message out and their measure or name on the ballot; even if the plaintiff provides such facts, the measure is constitutional if the State has a compelling interest and a tailored solution.

Here, Plaintiff offers no evidence of any burden it has faced in getting candidates on the ballot in any type of Wisconsin election, much less across the board or in a wide swath of applications. And even if heightened scrutiny applied, Wisconsin has compelling interests recognized by the courts and a solution narrowly tailored to those interests. The Court should grant summary judgment in the Commission Defendants' favor.

## STATEMENT OF FACTS

### I. Circulators provide a certification about the signatures collected for a candidate other than presidential candidates.

Circulators assist a candidate in obtaining the required number of signatures for a candidate's nomination papers or assist a recall petitioner to gather enough signatures. *See* Wis. Stat. §§ 8.10, 8.15, 8.20, 9.10; (*see also* Second Kehoe Decl. ¶¶ 17–18). Circulators must provide a certification attesting to the facts relating to the signature and signer. Wis. Stat. §§ 8.15(4)(a), 8.20(3), 8.40(2). Candidates must gather between a few hundred to a few thousand signatures, depending on the office: for state senate, 400 to 800 signatures are required, while for Governor, 2,000 to 4,000. Wis. Stat. § 8.15(6)(c), (a). A circulator must attest to seven statutory facts: that he (1) personally circulated the nomination paper and personally obtained each of the signatures; (2) knows they are electors of the ward, aldermanic district, municipality or county, as the nomination papers require; (3) knows they

signed the paper with full knowledge of its content; (4) knows their respective residences given; (5) knows each signer signed on the date stated opposite his or her name; (6) intends to support the candidate; and (7) is aware that falsifying the certification is punishable under Wis. Stat. § 12.13(3)(a). *See* Wis. Stat. §§ 8.15(4)(a), 8.20(3).

Under Act 126, circulators must also be eligible to vote in Wisconsin. The voter-eligibility requirement does not apply to presidential/vice-presidential candidate papers or to local referendum petitions. *See* 2025 Wis. Act 126; (*see also* Second Kehoe Decl. ¶ 6). Neither Act 126 nor any other provision of Wisconsin law prevents others—whether Wisconsin residents or otherwise—from accompanying a circulator or advocating alongside a circulator during signature collection. (Defs. PFOF ¶ 4; Second Kehoe Decl. ¶ 27.)

## II. The election process proceeds speedily, with a tight window for challenges to nomination papers.

Wisconsin's ballot challenge process proceeds very quickly so that the election cycle can proceed in a timely manner.

After nomination papers and recall petitions are submitted, opponents may challenge the validity or adequacy of nomination papers and recall petitions. Wis. Admin. Code EL §§ 2.07, 2.11; *see also* Wis. Stat. § 8.07. This year's calendar demonstrates the steps in action.

For the upcoming November 2026 elections, for nomination papers filed by June 1, 2026, the deadline for challenges was June 4, 2026. Wis. Admin. Code EL § 2.07(3)(b); (*see also* Defs. PFOF ¶ 14; Second Kehoe Decl. ¶¶ 15, 29). Those challenges had to be decided by the filing officer (the Commission or filing officer, depending on the office) within six days—not later than June 10, 2026. Wis. Admin. Code EL § 2.07(3)(h); (*see also* Defs. PFOF ¶ 15; Second Kehoe Decl. ¶ 34). Following that June 10 deadline, the Commission certified the list of candidates. Wis. Stat. § 10.06(1)(h); (*see also* Defs. PFOF ¶ 15; Second Kehoe Decl. ¶ 34).

### III. In 2024, petitions to recall Robin Vos led to signature challenges and in 2026, a criminal referral by the Commission to the District Attorney.

In 2024, Wisconsin saw two unsuccessful petitions to recall Representative Robin Vos. The petitions were the subject of two different proceedings. Representative Vos filed challenges to the sufficiency of each petition. (Defs. PFOF ¶¶ 20, 37; Second Kehoe Decl. ¶¶ 43, 60, Ex. A–B.) Separately, the Commission investigated incidents surrounding circulator activity for that recall effort. (Defs. PFOF ¶¶ 45–53; Second Kehoe Decl. ¶¶ 67–73, Ex. C.)

Representative Vos[1] asserted that a private investigator found that four out-of-state convicted felons circulated 94 recall papers, (Defs. PFOF ¶¶ 21, 40; Second Kehoe Decl. ¶¶ 44, 63), and provided affidavits from voters stating that the signatures included forged versions of their names, those of their minor children, and that of a man currently in the Racine County Jail, (Defs. PFOF ¶¶ 24, 29, 34; Second Kehoe Decl. ¶¶ 47, 52, 57). Others said that they were told the petition involved support for women's rights, or protesting the sale of farmland to China, or informed that a person does not be eligible to vote to sign a petition. (Defs. PFOF ¶¶ 30, 32, 42; Second Kehoe Decl. ¶¶ 53, 55, 65.)

The Commission has the power to investigate violations of Wisconsin's election laws upon submission of a complaint to the Commission. Wis. Stat. §§ 5.05, 5.06. Here, it investigated issues surrounding the recall effort and found probable cause to believe that violations of Wisconsin criminal law were committed by several different individuals. (Defs. PFOF ¶¶ 45–53; Second Kehoe Decl. ¶¶ 67–73, Ex. C.)

As reflected in a February 27, 2026, letter to the District Attorney, the Commission found probable cause to believe that people had falsely listed an address that was not their residence on the circulator

[1] The exhibits to Representative Vos's verified challenge dated June 7, 2024, are available online on the Commission's website: *June 2024 Quarterly Meeting 6/27/2024*, Wis. Elections Comm'n (June 27, 2024) https://elections.wi.gov/event/june-2024-quarterly-meeting-6272024.

certification. (Defs. PFOF ¶ 47; Second Kehoe Decl. ¶ 67, Ex. C.) The Commission also found probable cause to believe that multiple individuals violated Wisconsin law prohibiting falsifying or fraudulently defacing or destroying a recall petition, given evidence from several individuals who attested that they had not actually signed the recall petition at issue. (Defs. PFOF ¶¶ 48–49; Second Kehoe Decl. ¶¶ 68–69, Ex. C.)

Act 126 was signed into law on March 27, 2026, after the Commission's referral to the District Attorney.

### IV. Procedural history.

This case was brought by a Virginia advocacy group that says it seeks to support candidates who "promote election integrity" and "support policies that ensure only United States citizens vote in American elections." (Dkt. 1-1:12.) It asserts that it wishes to "work with out-of-state residents to collect nomination signatures on behalf of Wisconsin candidates." (Dkt. 44 ¶ 32.) It asserts that it has entered into an agreement with a Michigan-based entity that hires petition circulators. (Dkt. 44 ¶ 38.)

Plaintiff brought suit in state court, raising facial challenges to Act 126's provisions. (Dkt. 1-1:10–18.) The Commission removed the matter on May 4, 2026. (Dkt. 1.) Plaintiff moved for a temporary restraining order and preliminary injunction that day. (Dkt. 6.) After briefing, the Court denied temporary relief, and summary judgment briefing now follows.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is warranted where the party opposing the motion "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

For a facial challenge, a plaintiff generally must "establish that no set of circumstances exists under which the [law] would be valid," or must show that the law lacks "a plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (alteration in original) (citations omitted). In some First Amendment cases, the Supreme Court recognizes an overbreadth standard: "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted).

## ARGUMENT

Plaintiff fails to show that Act 126 is unconstitutional in a single application, much less more broadly. The law is not subject to heightened scrutiny because it creates no severe burdens: all Wisconsinites eligible to vote

can be circulators, and Plaintiff offers no evidence that it faces hurdles in helping candidates gather sufficient signatures for any Wisconsin office. Even if Act 126 were subject to heightened scrutiny, the State's interest in deterring fraud and ensuring election integrity are recognized compelling interests, and the law is narrowly tailored to address them.

Plaintiff's string cite of cases demonstrates what this case lacks: laws that significantly shrank the circulator pool and evidence from Plaintiff about the difficulties those laws presented for initiative proponents or candidates to get on the ballot. And the Presidential candidate cases have no application here, because Act 126 does not apply to such elections.

## I. Circulator regulations are subject to heightened scrutiny only if they severely burden candidates' ability to get on the ballot; even when heightened scrutiny applies, regulations are lawful when they are narrowly tailored to a compelling interest.

States have broad leeway to regulate elections, and so long as a regulation does not severely burden on voters and candidates, it is reviewed under rational basis review. Even if a plaintiff can demonstrate such a burden, a regulation is still upheld if it is narrowly tailored to a compelling interest. That standard applies to regulations of petition and campaign nomination paper circulators: courts have applied heightened scrutiny where the regulation placed substantial burdens on candidates' ability to get on the

ballot, and even under heightened scrutiny, have upheld measures narrowly tailored to a compelling interest.

### A. States have broad leeway to regulate elections, and election regulations not posing a severe burden are not subject to heightened review.

In *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997), the Supreme Court recognized that while candidates and parties have First Amendment rights of association that enjoy constitutional protection, States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.

To decide whether a state election law violates the First or Fourteenth Amendment, courts "weigh the 'character and magnitude' of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Id.* at 358 (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "[N]o litmus-paper test . . . separat[es] those restrictions that are valid from those that are invidious . . . . The rule is not self-executing and is no substitute for the hard judgments that must be made." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

### B. The Supreme Court has evaluated regulations of people gathering initiative signatures based on whether the initiative's message can be carried to the State's voters and faces significant hurdles in reaching the ballot.

The U.S. Supreme Court has twice considered challenges to laws regulating signature gatherers for statewide constitutional referenda: *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999). While the relevant strands of First Amendment law between initiative petitions and candidate nominating papers are somewhat different, the Court's reasoning is helpful in both contexts.

In *Meyer*, the Court considered a prohibition on paying people to circulate statewide initiatives. 486 U.S. at 421. The Court identified two considerations to aid in determining whether a regulation imposes a severe burden: the extent to which it limits the number of voices carrying the proponent's message and size of the audience the proponent can reach; and the extent to which the regulation makes it less likely the measure will reach the ballot. *Id.* at 422–23.

In *Buckley*, the Court considered requirements imposed by Colorado on signature gatherers for statewide constitutional initiatives. 525 U.S. at 205. The Court recognized that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* at 187 (citation omitted). The

Court reasoned that the legal questions surrounding initiative petition gatherers were a hybrid of two different strands of law: those relating to candidate-petition circulators, which relied on ballot access principles in *Timmons*, and handbill distributors advocating for change, governed by *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995). *Buckley*, 525 U.S. at 187.

The Court then assessed the burden caused by Colorado's requirement that gatherers be registered voters. The Court concluded that the voter registration requirement shrank the pool of potential gatherers by about 400,000 from the number of adult Colorado residents, significantly decreasing the number of voices who would convey the proponents' message and substantially reducing the chances that the initiative would reach the ballot. *Id.* at 194–95.

Because the plaintiffs did not challenge Colorado's residency requirement, the Court did not consider that law. *Id.* at 197. But the Court reasoned that Colorado's "strong interest" in being able to subpoena circulators to investigate the validity of signatures was "more precisely achieved" by the requirement that they attest to their Colorado address. *Id.* at 196–97 (citation omitted).

In dissent, Chief Justice Rehnquist suggested the majority's decision would be read to preclude States from imposing an elector or residency

requirement, suggesting that children or foreign citizens must be permitted and many state laws would appear to be "in serious constitutional jeopardy." *Id.* at 231–32 (Rehnquist, C.J., dissenting). The majority rejected his concerns, quoting Judge Bork that "[j]udges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom." *Id.* at 194 n.16.

### C. Lower courts have since upheld some residency requirements and rejected others, depending on the burdens presented and the State's interests.

Since *Buckley*, lower courts have considered challenges to state and local laws that regulate who may gather initiative petition signatures or circulate candidate nomination papers. They have upheld some residency requirements and rejected others. In cases where plaintiffs have not presented evidence of significant burdens, courts have reviewed the regulations for reasonableness. In cases where plaintiffs proved that the laws severely burdened their ability to spread their message and get a measure or candidate on the ballot, courts have reviewed whether States have a compelling reason for the regulation tailored to that interest.

#### 1. Courts have applied heightened scrutiny only where they found severe burdens.

In evaluating the burden posed by residency requirements, courts have considered the *Buckley* factors: the impact on the quantity of speech about the relevant issue, and the initiative or candidate's ability to reach the ballot. They

have concluded that heightened scrutiny is appropriate only where the law substantially reduces the pool of potential circulators and where the plaintiff demonstrates factual burdens in getting measures or candidates to the ballot.

#### a. Residency requirements for petition initiatives.

In the context of residency requirements for petition gatherers, where any person eligible to vote in a State can serve as a circulator, several courts have concluded that such regulations are not subject to heightened scrutiny because they do not severely burden proponents' ability to speak on the issue and get it on the ballot. In contrast, courts have held that heightened scrutiny applies to *local* residency requirements, which significantly shrank the pool, or where plaintiffs showed that they needed out-of-state professional circulators to obtain the many needed signatures for a statewide referendum.

In *Florida Decides Healthcare Inc. v. Florida Secretary of State*, 2025 WL 3738554, *4 (11th Cir. Sept. 9, 2025), the court concluded that a Florida law requiring petition circulators to be eligible to vote in Florida did not present a severe burden because it did not substantially limit the ability of noncitizens and nonresidents to speak on the issue. The law required circulators to collect and deliver petitions, which the court doubted "was speech at all." *Id.* And the court reasoned that the law did not prohibit noncitizens or

nonresidents from engaging those voters in persuasive speech for their views. *Id.*

In *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001), the Eighth Circuit concluded that no heightened scrutiny was appropriate because the regulation there, which required North Dakota residency, caused no significant drop-off in the number of potential circulators: "all 476,000 of North Dakota's eligible voters may circulate petitions, unlike the situation in *Buckley*, where many Colorado residents would have been unable to engage in petition circulation." And in *Idaho Coalition United for Bears v. Cenarrusa*, 234 F. Supp. 2d 1159, 1163–64 (D. Idaho 2001), the court found that there was no severe burden where plaintiffs provided "no evidence that there are not enough Idaho residents to serve as circulators, or that non-residents make especially effective circulators."

Courts have found severe burdens where statutes or ordinances imposed local residency requirements, severely reducing the number of gatherers. *See Chandler v. City of Arvada*, 292 F.3d 1236, 1244, 1241 (10th Cir. 2002) (ordinance requiring petition circulators to be city residents; it is "no small undertaking" to get a measure on the ballot) (citation omitted)); *KZPZ Broad., Inc. v. Black Canyon City Concerned Citizens*, 13 P.3d 772 (Ariz. Ct. App. 2000) (requiring county residency); *Preserve Shorecliff Homeowners v. City of San Clemente*, 158 Cal. App. 4th 1427, 1443–44 (Cal. Ct. App. 2008) (requiring

referendum circulators to be city residents). Courts have also held that heightened scrutiny was appropriate where plaintiffs argued that they needed professional circulators unavailable in the State to get sufficient signatures to get statewide initiatives on the ballot.[2] *See Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1026 (10th Cir. 2008); *We the People PAC v. Bellows*, 40 F.4th 1, 18 (1st Cir. 2022) (63,067 signatures required; district court found that Maine had only six professional circulators).[3]

**b. Residency requirements for candidate nomination paper circulators.**

*Meyer* and *Buckley* did not address regulations for candidate signature gathering, although *Buckley* recognized that campaign nomination papers fall under *Timmons*' standards for evaluating ballot access regulations. *Buckley*, 525 U.S. at 187. But courts reviewing regulations for candidate nomination paper circulators have focused on the burdens they place on candidates to gain access to the ballot.

As with the regulation of petition gatherers, residency requirements for circulators impose severe burdens where they limited participation more

[2] Unlike many States, Wisconsin has no mechanism for voters to petition for a constitutional amendment; only the Legislature can put such measures on the ballot. *See* Wis. Const. art. XII, § 1.

[3] Only one court, *Pierce v. Jacobsen*, 44 F.4th 853, 859, 861 (9th Cir. 2022) (citation omitted), concluded there was a severe burden with no showing of actual burdens, concluding that any limitation on "interactive communication concerning political change" amounted to a severe burden.

strictly than statewide residence, and the candidates present evidence of the burden presented. *Krislov v. Rednour*, 226 F.3d 851, 856 (7th Cir. 2000), considered an Illinois statute that required circulators to be registered to vote and to live in the district of the relevant office, and *Lerman v. Board of Elections of New York*, 232 F.3d 135, 139 (2d Cir. 2000), considered a New York law that required circulators to be registered to vote in the candidate's party and be a resident of the office's political subdivision.

In both cases, the plaintiffs presented evidence that the laws created significant hurdles to their appearance on the ballot. In *Krislov*, the two plaintiffs faced challenges that some circulators were not registered voters in the relevant districts; the plaintiff who wanted to run for the U.S. House of Representatives also needed to find registered voters living in his congressional district. 226 F.3d at 856. In *Lerman*, the candidate wanted to run for the New York City Council, but there were only 760 people who were eligible circulators, and he did not appear on the ballot. 232 F.3d at 139, 147.

In concluding that the laws imposed a severe burden on the candidates, the courts focused on the number of circulators excluded or, put another way, the limited number of eligible gatherers. *Krislov* held that "[w]hat is particularly important in this case, and what was correctly the focus of the district court's attention, is the number of people the registration and residency requirements exclude." 226 F.3d at 860. The court compared the number of

people eligible under the law to the number of all adult Illinois residents, resulting in a reduction "in the millions." *Id*. *Lerman* concluded that the New York provision there severely burdened political speech by "drastically reduc[ing] the number of persons . . . available to circulate petitions." 232 F.3d at 146 (alteration in original) (citation omitted).

Similarly, in *Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003), the district court applied the same framework to a Wisconsin law that required circulators to live in a specific political district. The court found that the restrictive geography created a significant burden for the plaintiffs, who were members of a small third party. *Id*. at 965.

**c. Residency requirements in the context of Presidential campaigns.**

Challenges to laws requiring campaign circulators to be state residents have reached the appellate courts only in the context of *Presidential* campaigns. The Supreme Court has explained that States have reduced interests in election regulations that govern presidential elections because their results affect every person in the United States:

> [I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation. Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential elections than statewide

or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.

*Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983) (footnotes omitted). Thus, even where a statewide or voter-eligibility requirement would normally pass muster, it does not in the Presidential candidacy setting. *See Daien v. Ysursa*, 711 F. Supp. 2d 1215, 1233 (D. Idaho 2010). In three suits brought by third party candidates for President or their supporters, courts held that States could not impose a residency requirement for candidate circulators. *See Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008); *Nader v. Blackwell*, 545 F.3d 459, 475 (6th Cir. 2008); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013).[4]

#### 2. Even when heightened scrutiny applies, regulations pass muster if the State has compelling interests and a tailored solution.

Even where courts have concluded that a regulation creates substantial burdens on proponents' ability to speak on a measure and bring it to the ballot, the measure is still lawful if the State has strong interests and a solution tailored to the problem.

[4] Amicus Pete Karas says Wisconsin's law is fatally underinclusive because it exempts Presidential nominating processes. (Dkt. 49:10.) That is incorrect: Wisconsin properly exempted such contests because the constitutional analysis is different. He briefly hints that Wisconsin should not have exempted local referenda, either, but such local contests present different problems, and "[t]he First Amendment does not require States to regulate for problems that do not exist." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 451 (2015) (citation omitted).

*Buckley* did not articulate a strict scrutiny standard for evaluating measures that impose significant burdens; Justice Thomas, who believed that strict scrutiny provided the right framework, thus concurred only in the judgment. 525 U.S. at 206 (Thomas, J., concurring). Lower courts since *Buckley* have applied different varieties of heightened scrutiny, including exacting scrutiny or strict scrutiny. *Compare, e.g.*, *Krislov*, 226 F.3d at 862, *with Brewer*, 531 F.3d at 1036. Under exacting scrutiny, the State need not use the least restrictive means available, so long as its method does not burden more speech than necessary to serve its compelling interests. *Krislov*, 226 F.3d at 863.

Whatever form of heightened scrutiny applies, courts have consistently recognized that deterring fraud and ensuring the integrity of the election process are compelling interests that justify regulation of candidate elections. *See Timmons*, 520 U.S. at 358; *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "The State's interest is particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well: It 'drives honest citizens out of the democratic process and breeds distrust of our government.'" *John Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010) (citation omitted). And the State's interest in preserving electoral integrity extends beyond fraud "to efforts to ferret out invalid signatures caused not by fraud but by simple mistake, such as duplicate signatures or signatures of individuals

who are not registered to vote in the State," and "to promoting transparency and accountability in the electoral process." *Id.* at 198.

A State's interest in deterring fraud is a compelling interest that justifies a residency requirement, even under heightened scrutiny. In *Kean v. Clark*, 56 F. Supp. 2d 719, 733 (S.D. Miss. 1999), the court held that deterring fraud was a compelling interest to require initiative circulators to be eligible to vote in the State. The court concluded that the residency requirement was narrowly tailored to achieve that interest, pointing to the State's inability to criminally prosecute out-of-state circulators under its circulator requirements without a "drawn-out, expensive extradition process." *Id.* (citation omitted). Other courts have recognized that a residency requirement would be justified where a State has evidence of fraud underlying its regulation. *See Nader*, 531 F.3d at 1037; *Krislov*, 226 F.3d at 866 n.7.

## II. Act 126's provisions are constitutional; they do not severely burden speech, and even if they were subject to exacting scrutiny, the State has compelling interests and a narrowly tailored solution.

Here, Wisconsin's law presents none of the severe burdens that caused some courts to invalidate other types of circulator regulations. Plaintiff makes no effort to show that the law severely burdens it in helping candidates spread their message and procure enough signatures to appear on the ballot.

Even if Wisconsin's law were subject to heightened scrutiny, it would pass that test. The Supreme Court has recognized that preventing fraud and ensuring the integrity of elections are compelling interests, and Act 126 is tailored to address those concerns.

### A. Wisconsin's circulator tasks either involve no speech or do not severely burden the ability of candidates to appear on the ballot.

Act 126 does not impose severe burdens on speech. Most of the circulator's statutory duties do not involve advocacy, and the one duty that involves speech creates no severe burdens on candidates or supporters like Plaintiff, who may draw on almost any adult Wisconsinite to serve in the role. Plaintiff offers no facts demonstrating any difficulty that any candidate or Plaintiff faces in ensuring that candidates successfully gather sufficient signatures.

#### 1. Most of a circulator's duties involve no speech.

Wisconsin law requires candidate nomination papers to be accompanied by a signed and dated statement by the "qualified circulator" (who may also be the candidate himself or herself), certifying to seven things:

- He or she personally circulated the nomination paper and personally obtained each of the signatures;
- He or she knows they are electors of the ward, aldermanic district, municipality or county, as the nomination papers require;
- He or she knows they signed the paper with full knowledge of its content;

- He or she knows their respective residences given;
- He or she knows each signer signed on the date stated opposite his or her name;
- He or she intends to support the candidate; and
- He or she is aware that falsifying the certification is punishable under Wis. Stat. § 12.13(3)(a).

*See* Wis. Stat. §§ 8.15(4)(a), 8.20(3).

Of the seven statutory attestations, six have nothing to do with speech. They instead ensure that the signatures contain the requirements for valid signatures required by state law, compliance with which could be challenged in an opponent's challenge to the candidate's nominating papers. The circulator's name and address must appear on each individual page of the nomination pages, making it clear who has certified those signatures in the event of challenges.

As in *Florida Decides Healthcare Inc.*, such tasks do not implicate the First Amendment. 2025 WL 3738554, at *4. And they do not acquire First Amendment protection just because they are combined with another activity that involves speech. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 297–98 (1984).

Plaintiff has made no effort to show that requiring state residence to carry out these statutory duties is unlawful in any application.

### 2. Regarding the gathering of signatures, Plaintiff has demonstrated no severe burden on its preferred candidates' ability to get on the ballot.

That leaves the first statutory duty, the circulator's attestation that she circulated the paper itself and obtained the signatures. As an initial matter, and as in *Florida Decides Healthcare Inc.*, this requirement does not prevent a non-Wisconsinite from accompanying a qualified circulator as she hands out nomination papers to sign and speaking about his own views on the candidate. 2025 WL 3738554, at *4; (*see also* Defs. PFOF ¶ 4; Second Kehoe Decl. ¶ 27).

And as to the relevant burdens under *Buckley*, the law does not reduce the pool from the baseline of all Wisconsin adults because almost every Wisconsin adult can be a circulator. Outside the Presidential election context, the baseline to measure how a law reduces eligible circulators is the number of adults in the relevant State, not the nation (or world) as a whole. *Buckley* compared the baseline number of Colorado adult residents with the number of people allowed to serve under the challenged law—Colorado registered voters—and calculated the difference as a loss of 400,000 people. 525 U.S. at 194–95. Other courts have also used a State's adult population as the baseline against which to measure the number of people removed from eligibility by the relevant law. *See Krislov*, 226 F.3d at 860 (comparing number of people eligible under the Illinois law with the number of Illinois adults, and

concluding it reduced the number by "millions"); *Jaeger*, 241 F.3d at 617 (reasoning that all North Dakota residents were eligible circulators, unlike in *Buckley*).

Here, measured against the number of all Wisconsin adults, Act 126's number of eligible circulators is not significantly less. The statute requires only eligibility to vote, not registration, and eligibility includes all adults except those who have been adjudged incompetent, have not lived 28 days at an address, or are serving a felony criminal sentence. *See* Wis. Stat. § 6.03 (disqualifications to vote). Wisconsin's law is unlike the state regulations in cases where plaintiffs could demonstrate that local residence, voter registration, or party affiliation requirements created substantial burdens on the plaintiff in trying to get a candidate or initiative on the ballot by dramatically reducing the pool of eligible people. Here, Plaintiff and the candidates it supports can use almost all Wisconsin adults—a pool of millions.

Plaintiff offers no support for the conclusion that the law will prevent candidates from getting on the ballot. Plaintiff not only offers no evidence that the regulation has shrunk the pool from the number of adult Wisconsinites in a way that causes a significant burden, but also no evidence that, like in some of the statewide initiative cases, professional circulators from outside the State are needed to obtain tens of thousands of signatures.

Plaintiff instead suggests a different rule of law, that the law is per se unconstitutional if it cannot contract with the out-of-state circulator firm it prefers. (Dkt. 42:17, 22.) It announces that it is prohibited from working with an out-of-state resident and that "[a]s a result," its free speech rights are "severely burden[ed]." (Dkt. 42:22; 43 ¶¶ 12–13.) But courts have not recognized such a per se rule for the candidate nomination process. Plaintiff must show an actual burden on getting candidates on the ballot, not just a per se right to use out-of-state circulators.

Even if Plaintiff had legal support for the theory that it has a constitutional right to work with a particular company, its claim would fail factually. Plaintiff is free to contract with whatever professional firm it wants—the firm simply must hire (or contract with) Wisconsinites to serve as its circulators on the ground. And out-of-state individuals can accompany the Wisconsin circulator as he carries out his duties and advocate for a candidate, as well.

It is Plaintiff's job to show significant burdens on its ability to get its candidates' messages to the voters and their names on the ballots,

and here it offers no factual support.[5] Act 126 is not subject to heightened scrutiny.

### B. Even if Act 126's provisions were subject to heightened scrutiny, Wisconsin has recognized compelling interests, and Act 126 is narrowly tailored to address them.

Even if Act 126's provisions were subject to heightened scrutiny, the law has compelling interests and is narrowly tailored to address them.

Act 126 promotes two compelling interests: that (1) they can be held criminally accountable under Wisconsin's law prohibiting fraudulent conduct and (2) fast-moving ballot challenges, part of the State's interest in election integrity, can be properly considered and decided. A statewide residency requirement is narrowly tailored to those interests.

---

[5] Amicus Karas makes unsupported factual assertions that third party candidates will struggle if they cannot use out-of-state circulators. (Dkt. 49:12–13.) Those assertions are not evidence. Indeed, Karas says he was able to gather well over the 2,000 signatures required without out-of-state circulators. (Dkt. 49:5–6.) His assertion that he spent money because of a sufficiency challenge fails to mention that the challenger raised multiple deficiencies, not just circulator residency. (Second Kehoe Decl. ¶ 77, Ex. D.)

Karas' real complaint is that the residency requirement will become one more reason for the Democratic Party to challenge Green Party petitions. (Dkt. 49:12 (the "Green Party now distrusts every ballot access 'reform' that the two major parties propose").) He offers a recitation of the Green Party's struggles to gather signatures for its 2020 and 2024 Presidential candidates—processes to which Act 126 did not apply and would not today. (Dkt. 49:11–12.) He makes no assertion that the First Amendment prohibits regulating the circulation process based on the risk that political parties might weaponize the requirements in sufficiency challenges.

First, the State's criminal penalties applicable to fraudulent circulator misconduct—Wis. Stat. § 12.13—have teeth only if the State can hale the person before a court. As the court explained in *Kean*, getting criminal defendants returned to a state for criminal prosecution requires extradition, a complex and uncertain process. 56 F. Supp. 2d at 732–33.

Here, early in 2026, the Commission found probable cause that multiple out-of-state individuals had violated Wisconsin's criminal statutes in carrying out their circulator duties, making a referral to the Racine County District Attorney. (Defs. PFOF ¶¶ 45–53; Second Kehoe Decl. ¶ 67–73, Ex. C.) But those who do not reside in Wisconsin cannot be prosecuted in Wisconsin without extradition. Requiring circulators to be Wisconsin electors ensures that they are meaningfully accountable under the State's criminal laws if they engage in fraudulent election activity.

Plaintiff says that the law "already has mechanisms to deal with" these problems, pointing to the prohibition on felons serving as circulators. (Dkt. 42:27.) But according to the sufficiency challenge brought in the Vos recall matter, some of the out-of-state circulators did have felony convictions; this prohibition did not deter them. (Defs. PFOF ¶ 21; Second Kehoe Decl. ¶ 44.) Plaintiff also suggests that the circulators simply agree to return if the State summons them. (Dkt. 42:27.) While that might work in a civil proceeding if the timelines allowed, it would not address the challenge of bringing a person

to the State to face felony criminal charges. Indeed, even discovering the circulator's true address and criminal history can be more challenging when the circulator lives out of state. (Defs. PFOF ¶¶ 54–58; Second Kehoe Decl. ¶ 74.)

Plaintiff asserts that *Frami* rejected a residency requirement as a narrowly tailored solution to deterring and prosecuting fraud. (Dkt. 42:24.) Not so. *Frami* rejected a law requiring circulators to come from a particular district of the State as an anti-fraud tool because the State's subpoena power reached everyone in the State. 255 F. Supp. 2d at 969. *Frami* also suggested that the risk of fraud is more acute at the time of the petition than voting. *Id.* at 969–70 (citing *Meyer*, 486 U.S. at 427), but *Meyer* was contrasting the risk of fraud between initiatives and candidate elections, 486 U.S. at 428; since that case, the Supreme Court has reinforced that States have compelling interest in election integrity and deterring fraud at the signature gathering phase, *John Doe No. 1*, 561 U.S. at 197. And *Frami* described the "more significant" hurdle with defendant's fraud argument there as the lack of any evidence, or even an allegation that the State had experienced fraud problems. 255 F. Supp. 2d at 970. That is not the case here.

A second compelling interest is the State's interest in ensuring the integrity of elections, which includes considering and deciding ballot access challenges. For the general fall election, that process takes place in less than

a week. Wis. Stat. § 9.10(3)(b), (4)(a); Wis. Admin. Code EL § 2.07(3), (3)(b), (j), (7); (*see also* Defs. PFOF ¶¶ 14–15; Second Kehoe Decl. ¶¶ 15, 29). Circulators are critical to determining those facts: they have attested they are knowledgeable about common issues like the voter's understanding of her signature, whether she lives in the relevant district, whether she is eligible to vote. *See* Wis. Stat. § 8.15(4)(a). The extra time required to locate and arrange the participation of out-of-state circulators, and lack of subpoena reach, impede the candidates' ability to question them and the Commission's and local filing officers' ability to consider and decide challenges on the statutory timeline.

Plaintiff argues that circulators should simply agree in advance to service of a subpoena in their home States, although Plaintiff does not concede that even that would be constitutional. (Dkt. 42:27–28.) While that measure might work for a slow-moving civil investigation, Wisconsin's six-day process requires far more speed.

As to both fraud and election integrity, Wisconsin's law is narrowly tailored to the compelling interests it serves. Any eligible voter in the State can serve, which furthers immediate availability and amenability to criminal prosecution. And it does not reach more broadly: the law requires no voter registration or local residence, and it does not include Presidential elections or local referenda.

### C. At the very least, Plaintiff has failed to make the showing it would need to facially invalidate the statute.

Even if Plaintiff could show that the law was unconstitutional as to a particular election or type of office, it has not begun to show that the law imposes a severe burden as to offices requiring a few hundred signatures.

Even under an overbreadth standard, a plaintiff must show that a "substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). *Meyer* and *Buckley* did not discuss this problem because, in a challenge to a requirement for initiative signature gatherers, there was only one type of election with a minimum signature requirement and attendant challenges. Plaintiff challenges a law that applies to candidates for hundreds of offices in Wisconsin, with different signature requirements and geographic scope. Plaintiff has failed to create a genuine issue of material fact about the constitutionality of the law in these many applications.[6]

[6] And there is surely no justification for an injunction. *See Badger Cath., Inc. v. Walsh*, 620 F.3d 775, 782 (7th Cir. 2010) (injunctions disfavored where a declaration would suffice).

## CONCLUSION

This Court should grant summary judgment in favor of the Commission Defendants.

Dated this 1st day of October 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (CG)
(608) 266-8101 (HSJ)
(608) 294-2907 (Fax)
Charlie.Gibson@wisdoj.gov
Hannah.Jurss@wisdoj.gov

## CERTIFICATE OF SERVICE

I certify that on October 1, 2026, I electronically filed the foregoing Defendants' Brief in Support of Summary Judgment and in Opposition to Plaintiff's Summary Judgment Motion with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 1st day of October 2026.

Electronically signed by:

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General