IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

AMERICANS FOR CITIZEN VOTING PAC,

Plaintiff,

v. Case No. 26-CV-0786

MEAGAN WOLFE, et al.,

Defendants.

---

**DEFENDANTS' REPLY BRIEF**
**IN SUPPORT OF SUMMARY JUDGMENT**

---

JOSHUA L. KAUL
Attorney General of Wisconsin

CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (CG)
(608) 266-8101 (HSJ)
Charlie.Gibson@wisdoj.gov
Hannah.Jurss@wisdoj.gov

## ARGUMENT

Plaintiff fails to show that 2025 Wis. Act 126 is unconstitutional in a single application, much less more broadly. The law is not subject to heightened scrutiny because it creates no severe burdens: all Wisconsinites eligible to vote can be circulators, and Plaintiff offers no evidence that the law creates substantial burdens for it (or candidates it supports) in getting out their message or obtaining sufficient signatures for any Wisconsin office. Even if Act 126 were subject to heightened scrutiny, the State's interest in deterring fraud and ensuring election integrity are recognized compelling interests, and the law is narrowly tailored to address them.

### I. Misunderstanding *Meyer*, *Buckley*, and their progeny, Plaintiff makes no effort to show that it suffers severe burdens in getting its message out and its candidates on the ballot.

#### A. Plaintiff misunderstands *Meyer and Buckley.*

The Supreme Court has consistently recognized that States may regulate elections, and that so long as they do not impose severe burdens, they are reviewed only for reasonableness. *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), did not depart from that standard. In disagreeing with those basic ground rules, Plaintiff fundamentally misreads those cases.

*Timmons v. Twin Cities Area New Party* recognizes that candidates and parties have First Amendment rights of association that enjoy constitutional protection, but that States nevertheless may, and inevitably must, enact

reasonable regulations of parties, elections, and ballots. 520 U.S. 351, 357 (1997); *see also Buckley*, 525 U.S. at 187 ("There must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." (citation omitted)). To evaluate a regulation's constitutionality, courts must "weigh the 'character and magnitude' of the burden the State's rule imposes" and measure it against the State's interest. *Timmons*, 520 U.S. at 358 (citation omitted). That analysis looks at the law and facts in each case: "no litmus-paper test . . . separat[es] those restrictions that are valid from those that are invidious. . . . The rule is not self-executing and is no substitute for the hard judgments that must be made." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

*Meyer* and *Buckley* did not depart from those principles. Both cases analyzed the laws in question by considering whether they imposed a severe burden on the plaintiffs' rights: the extent to which the measure limited the number of voices carrying the proponents' message and size of audience the proponents could reach; and the extent to which the regulation made it less likely the measure will reach the ballot. *Meyer*, 486 U.S. at 422–23; *Buckley*, 525 U.S. at 193, 194–95.

*Buckley* compared the number of potential signature gatherers for a Colorado constitutional referendum under a law requiring gatherers to be registered voters with the number of Colorado residents, calculating the

decrease at about 400,000 fewer people. It concluded that this significant decrease—in the context of a statewide referendum requiring signatures totaling five percent of all votes cast for a statewide office in the prior election—as a "drastic[ ]" decrease in the number of voices who would convey the proponents' message and substantially reducing the chances that the initiative would reach the ballot. *Id.* at 193, 194–95.

Plaintiff's reading of *Buckley* and *Meyer* ignores the Court's analysis and plucks phrases out of context. Plaintiff says *Buckley* held that the law at issue was burdensome simply because it would "limit the number of voices who could convey the messages." (Dkt. 55:5.) Plaintiff ignores the Court's measurement of *how much* the law would reduce the number of eligible gatherers as against the number of state residents, and then analyzed how big an impact that would have.

Similarly, Plaintiff describes *Meyer* as holding that statutes are unconstitutional, per se, if they limit a plaintiff's choice about who they use as circulators. (Dkt. 55:4–5.) But the Court did not say that a regulation having any impact on a First Amendment activity is a per se severe burden. Instead, the Court discussed the actual burden the law at issue posed for the plaintiffs. *Meyer*, 486 U.S. at 417 (plaintiffs "would need the assistance of paid personnel to obtain the required number of signatures within the allotted time"); 423 (law makes it "less likely that appellees will garner the number of

signatures necessary to place the matter on the ballot"); 423 (observing that "the securing of sufficient signatures to place an initiative measure on the ballot is no small undertaking," and discussing challenges in getting people to do that work without compensation) (citation omitted).

### B. Lower court cases also require plaintiffs to show how the challenged law substantially burdens their ability to spread their message and get a candidate or measure on the ballot.

Lower court cases have followed *Buckley* and *Meyer* by evaluating whether the challenged regulation severely burdens the plaintiffs' ability to spread its message and get a candidate (or measure) on the ballot. In fighting that standard, Plaintiff has abandoned most of the cases it relied on in its opening brief and misunderstands the precedent it does cite.[1]

#### 1. Courts have concluded that state residency, standing alone, does not impose severe burdens on plaintiffs.

Courts have concluded that state residency, standing alone, does not present severe burdens for plaintiffs. *See Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, 2025 WL 3738554, *4 (11th Cir. Sept. 9, 2025) (requirement for

[1] Plaintiff describes Defendants as arguing that the standard is different for referendum signature gatherers and candidate nominating paper circulators. (Dkt. 55:9.) While the two draw from different lines of First Amendment precedent, the basic point here is how the facts are different: statewide referenda require tens of thousands of signatures, to be gathered in short amounts of time. Whether regulations present substantial burdens must be measured against the task the proponents face. Wisconsin's requirements for candidates are not nearly that difficult to meet.

petition circulators to be eligible to vote in Florida did not present a severe burden because it did not substantially limit the ability of noncitizens and nonresidents to speak on the issue); *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001) (state residency presented no severe burden where "all 476,000 of North Dakota's eligible voters [to] circulate petitions, unlike the situation in *Buckley*"); *Idaho Coal. United for Bears v. Cenarrusa*, 234 F. Supp. 2d 1159, 1163–64 (D. Idaho 2001) (no severe burden where plaintiffs provided "no evidence that there are not enough Idaho residents to serve as circulators, or that non-residents make especially effective circulators").

Plaintiff ignores *Jaeger* and *Cenarrusa.* It says *Florida Decides Healthcare* is an outlier (Dkt. 55:9), but it does not explain why that is so.

#### 2. State residency requirements pose severe burdens when referenda signature requirements require professional circulators not widely available in the State, or where presidential elections present different First Amendment interests.

Courts have found that plaintiffs demonstrated substantial burdens from state residency requirements in two circumstances, neither of which is presented here.

First, courts have found severe burdens where plaintiffs needed professional firms to obtain the tens of thousands of signatures required to put a statewide constitutional referendum on the ballot, and there was limited

availability of such firms within the State. *See Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1025–26 (10th Cir. 2008) (proponents had 90 days to gather signatures totaling 15 percent of total number of votes cast in last election; plaintiffs said that there were too few professional circulators in Oklahoma to meet that requirement); *We the People PAC v. Bellows*, 40 F.4th 1, 16–17 (1st Cir. 2022) (upholding preliminary injunction where law required 63,067 signatures to be gathered in limited time period, and plaintiffs presented evidence that Maine had few professional circulators who could effectively achieve that goal).

Second, courts have concluded that heightened scrutiny is triggered for laws requiring signature gatherers for presidential candidates to be state residents: citizens across the country have an interest in the outcome of the election, candidates need thousands of signatures, and States have fewer interests in regulation. *See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013); *Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008); *Nader v. Blackwell*, 545 F.3d 459, 475 (6th Cir. 2008); *Anderson v. Celebrezze*, 460 U.S. 780, 794–95 (1983) ("[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." (footnote omitted)).

Outside those two settings, only one court, *Pierce v. Jacobsen*, 44 F.4th 853, 859, 861 (9th Cir. 2022) (citation omitted), concluded there was a severe burden with no showing of actual hurdles, concluding that any limitation on "interactive communication concerning political change" amounted to a severe burden. The court cited no support for that per se rule or explain its deviation from *Buckley*, and it is out of step with the plethora of cases on this issue.

Other than its citation to *Pierce*, Plaintiff ignores the cases or misunderstands them. Plaintiff argues that *We the People PAC* imposed a per se ban on state residency, and that the presidential election cases are no different from other factual settings. (Dkt. 55:7–8, 10–11.) The decisions don't bear out those assertions.

In *We the People PAC*, the court credited the district court's findings that Maine faced a severe limitation on the number of voices available to circulate petitions, and that professional circulators—few of which existed in Maine—were more effective in gathering the large number of circulators. 40 F.4th at 16.

Regarding cases addressing state residency requirements in the context of presidential campaigns, *Daien v. Ysursa*, 711 F. Supp. 2d 1215, 1233 (D. Idaho 2010), distinguished the burdens presented by the state residency requirements in presidential and non-presidential contests. The *Daien*

plaintiff was an out-of-state supporter of an independent candidate for President, and the court held that all U.S. citizens (as well as the independent candidate there, Ralph Nader) had First Amendment rights to participate in a critical part of the campaign process. *Id.* at 1230, 1233. *Brewer* made the same point, holding that, in the context of a presidential campaign, a state voter registration requirement "excluded[ ] from eligibility all persons who support the candidate but who, like Nader himself, live outside the state of Arizona. Such a restriction creates a severe burden on Nader and his out-of-state supporters' speech, voting and associational rights." 531 F.3d at 1036.

### 3. Other regulations subjected to heightened scrutiny, including those in *Krislov*, involved requirements of voter registration, political party affiliation, and/or local residence.

The remainder of cases imposing heightened scrutiny involved more limiting requirements than state residency—voter registration, local residency, and/or political party affiliation. *See Krislov v. Rednour*, 226 F.3d 851, 856 (7th Cir. 2000) (circulators must be registered to vote and live in the district of the relevant office); *Lerman v. Bd. of Elections of N.Y.*, 232 F.3d 135, 139 (2d Cir. 2000) (circulators must be registered in candidate's party and reside in the political subdivision); *Chandler v. City of Arvada*, 292 F.3d 1236, 1244, 1241 (10th Cir. 2002) (city residency); *Frami v. Ponto*, 255 F. Supp. 2d 962 (W.D. Wis. 2003) (specific political district);

*KZPZ Broad., Inc. v. Black Canyon City Concerned Citizens*, 13 P.3d 772 (Ariz. Ct. App. 2000) (county residency); *Preserve Shorecliff Homeowners v. City of San Clemente*, 158 Cal. App. 4th 1427, 1443–44 (Cal. Ct. App. 2008) (city residency).

Although Plaintiff's opening brief cited these cases, its reply ignores most of them, suggesting it recognizes they are not on point. It does cite *Krislov* but ignores the Seventh Circuit's analysis. Taking language out of context, Plaintiff characterizes the court as holding that, per se, States must allow out-of-state residents to serve as circulators. (Dkt. 55:11.) But at the passage cited, *Krislov* was simply rejecting Illinois' proffered interest for the law—preventing residents in other States from having any influence on Illinois elections. 226 F.3d at 866.

*Krislov* did not create the per se rule Plaintiff desires. Instead, the court conducted the analysis required by *Buckley*: "[w]hat is particularly important in this case, and what was correctly the focus of the district court's attention, is the number of people the registration and residency requirements exclude." *Krislov*, 226 F.3d at 860. The court compared the number of people eligible under the law to the number of all adult Illinois residents, resulting in a reduction "in the millions." *Id.*

### C. Plaintiff offers no evidence of substantial burdens.

Here, Plaintiff offers no evidence of any burden Act 126 causes it, much less substantial burdens. It offers no facts showing Act 126 will make it more difficult for candidates it supports to spread their message or to gain access to the ballot. Wisconsin's law is thus subject only to review for reasonableness, like the laws at issue in *Florida Decides Healthcare, Jaeger*, and *Cenarrusa.* It is unlike the cases where either very large signature requirements for statewide referenda, the different interests at stake in presidential elections, or local residency or party affiliation requirements substantially burdened plaintiffs' ability to get their candidate or measure on the ballot.

Plaintiff asserts that *any* restriction in its hiring of circulators is per se a severe burden, and so it needs no facts. It announces that "[b]ecause residency requirements for petition circulators, like those imposed by Act 126, are severe burdens on free speech," without proving that they are burdens at all. (Dkt. 55:4.) It asserts that it need not show a "severe burden to [Plaintiff]; rather, the question is whether the statute itself imposes a severe burden." (Dkt. 55:6.) And it announces that a "restriction that clearly imposes a burden on core political speech, like Act 126, is unlawful" (Dkt. 55:6)—again begging the question of whether Act 126 poses a burden for Plaintiff.

That is not the governing standard under *Buckley*, *Meyer*, *Krislov*, and almost all other lower court cases. Plaintiffs must demonstrate how a

regulation burdens their ability to spread their message and get candidates or measures on the ballot. There is no per se rule.

### II. Even if Act 126 were subject to exacting scrutiny, the State has compelling interests and a narrowly tailored solution.

Even if Act 126 did impose substantial burdens on Plaintiff, requiring the State to satisfy exacting scrutiny, Wisconsin would meet that standard. Most of a circulator's duties do not involve speech. For the duty that does, Plaintiff appears to concede that Wisconsin's interests in preventing and deterring fraud and preserving electoral integrity are compelling interests. (Dkt. 55:12.) Requiring eligibility to vote is narrowly tailored to address them.[2]

To begin, six of seven of the circulator's statutory tasks involve no speech. *See* Wis. Stat. §§ 8.15(4)(a), 8.20(3). Those six ensure that the signatures contain the requirements for valid signatures required by state law, compliance with which could be challenged in an opponent's challenge to the candidate's nominating papers. As in *Florida Decides Healthcare*, such tasks do not implicate the First Amendment. 2025 WL 3738554, at *4. Plaintiff says the "entire process" is protected First Amendment activity, (Dkt. 55:8), but it

---

[2] On reply, Plaintiff raises a passing under-inclusiveness argument. (Dkt. 55:15.) This Court should ignore that new argument. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). Plaintiff seems to be borrowing from the amicus brief, (Dkt. 49), but courts do not ordinarily consider arguments presented by amici, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97 n.4 (1991). Defendants briefly addressed the argument in their first brief. (Dkt. 51:19 n.4.)

does not explain how the circulator's attestations about a signer's residency, elector status, and understanding of the document fall in that category.

That leaves the first statutory duty, the circulator's attestation that she circulated the paper itself and obtained the signatures. As in *Florida Decides Healthcare*, this requirement does not prevent a non-Wisconsinite from accompanying a qualified circulator and speaking about his own views on the candidate. 2025 WL 3738554, at *4; (*see also* Dkt. 53 ¶ 4). Plaintiff does not contend otherwise. And apart from that fact, eligibility to vote is narrowly tailored to the State's interests in deterring fraud and ensuring electoral integrity.

As to the State's interests in preventing and deterring fraud, as the court held in *Kean v. Clark*, 56 F. Supp. 2d 719, 733 (S.D. Miss. 1999), a residency requirement is narrowly tailored to prosecute and deter fraud because the State cannot otherwise criminally prosecute out-of-state circulators without a "drawn-out, expensive extradition process." *Id.* (citation omitted). The Commission demonstrated Wisconsin's recent experience with significant fraud concerns. The State's criminal penalties applicable to fraudulent circulator activity, Wis. Stat. § 12.13, have teeth only if the State can hale the person into a Wisconsin court.

Plaintiff does not discuss *Kean*. The cases it cites, (Dkt. 55:12–14), did not address the challenge of prosecuting fraud committed by circulators—they

focused on locating circulators to question them about signatories' fraud, problems the courts believed could be investigated by a circulator's agreement to comply with a subpoena. *See Judd*, 718 F.3d at 318 (State's desire to access circulators to discuss authenticity of signatures can be addressed by agreement to appear); *Yes on Term Limits*, 550 F.3d at 1030 (same); *Brewer*, 531 F.3d at 1037. Indeed, some noted that if there was evidence of fraud by the circulators themselves, different regulations could be warranted. *See Brewer*, 531 F.3d at 1037; *Krislov*, 226 F.3d at 866 n.7; *Frami*, 255 F. Supp. 2d at 970. Contrary to Plaintiff's assertion, (Dkt. 55:14), *Frami* did not hold that circulator fraud could not justify a state residency requirement; it said that Wisconsin presented no evidence of fraud at that time, *Frami*, 255 F. Supp. 2d at 970.

Those are not the facts here. The signature challenge included affidavits from voters stating that the signatures included forged versions of their names, those of their minor children, and that of a man currently in the Racine County Jail. (Dkt. 53 ¶¶ 24, 29, 34.) Others said that they were told the petition involved support for women's rights, protesting the sale of farmland to China, or that a person need not be eligible to vote to sign a petition. (Dkt. 53 ¶¶ 30, 32, 42.) After an investigation, the Commission found probable cause that multiple out-of-state circulators had violated Wisconsin's criminal

statutes. (Dkt. 53 ¶¶ 45–53.) Just as in *Kean*, the individuals cannot be brought back to the State without extradition.

In responding to Defendants' proposed findings of fact about allegations made in the verified challenges to the recall petition, and as to the Commission's probable cause determination and referral, Plaintiff does not dispute that the allegations were made, or that probable cause was found. Plaintiff asserts those facts are immaterial, (Dkt. 56 ¶¶ 21–35, 38–42, 45, 47–53), but that is incorrect: the existence of significant allegations of fraud committed by circulators, including out-of-state circulators, distinguishes Wisconsin's situation from the facts in the cases Plaintiff relies on.

At points, Plaintiff seems to recognize that fraud on circulators' part would be different, but it asserts that Wisconsin's experience is insufficient. It says that the circulators' alleged fraud was "unproven" and that acting on the problem would be "a stretch." (Dkt. 55:12.) Plaintiff does not offer a standard for how much fraud a State must encounter before it can regulate circulators. If a State must obtain some (unknown) number of criminal convictions, it would leave Wisconsin in a catch-22: if it cannot bring out-of-state circulators to trial, it cannot obtain the convictions Plaintiff says it needs to justify passing the law.

As to Wisconsin's interest in election integrity, Plaintiff fails to address the difference in pace between many States' slow-moving inquiries and

Wisconsin's six-day process for nomination paper challenges, which may require circulators to be immediately located. Wis. Stat. § 9.10(3)(b), (4)(a); Wis. Admin. Code EL § 2.07(3), (3)(b), (j), (7); (*see also* Dkt. 53 ¶¶ 14–15). Plaintiff says that there is "no guarantee" that any circulator will participate in such a process, even an in-state circulator. (Dkt. 55:13.) But Wisconsin submitted evidence that even discovering the circulator's true address can be more challenging when the circulator lives out of state. (Dkt. 53 ¶¶ 54–58),[3] and Plaintiff did not rebut that evidence.

As to both fraud and election integrity, Wisconsin's law is narrowly tailored to the compelling interests it serves.

At the very least, Plaintiff has failed to make the showing it would need to facially invalidate the statute. Plaintiff's no-harm-required theory is not the law, and it failed to prove its case factually even as to one type of office, much less all Wisconsin contests.[4]

---

[3] Plaintiff disputes some of Defendants' proposed facts supporting this point as unsupported, improper opinion, and speculative. (Dkt. 56 ¶¶ 54, 58.) Those objections are unfounded (Defs.' Reply in Supp. of Proposed Facts ¶¶ 54, 58) and create no material factual dispute for purposes of summary judgment.

[4] And even if the Court believed the statute were unconstitutional, no permanent injunction would be needed. In asking for a permanent injunction, Plaintiff conflates the standard for a *preliminary* injunction, where the irreparable harm prong is sometimes assumed in First Amendment cases. (Dkt. 55:17 (citing *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).)

## CONCLUSION

Defendants ask that the Court grant summary judgment in their favor.

Dated this 2nd day of November 2026.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General
State Bar #1038845

HANNAH S. JURSS
Assistant Attorney General
State Bar #1081221

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 957-5218 (CG)
(608) 266-8101 (HSJ)
(608) 294-2907 (Fax)
Charlie.Gibson@wisdoj.gov
Hannah.Jurss@wisdoj.gov

## CERTIFICATE OF SERVICE

I certify that on November 2, 2026, I electronically filed the foregoing Defendants' Reply Brief in Support of Summary Judgment with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 2nd day of November 2026.

Electronically signed by:

s/ Charlotte Gibson
CHARLOTTE GIBSON
Assistant Attorney General